IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Number: 2:07-578 |
| | ) | |
| -versus- | ) | MOTION TO RECONSIDER |
| | ) | |
| ALBERT E. PARISH | ) | |

On April 10, 2020, Albert Parish made a *pro se* motion for compassionate release, under 18 U.S.C. § 3582, on the basis that the inability of federal inmates to practice the social distancing necessary to prevent the spread of the COVID-19 virus, combined with his substantial comorbid medical conditions places him at high risk of both contracting the virus and of suffering its worst consequences. The Government filed its response in opposition on April 24, 2020, conceding this Court has jurisdiction, but arguing that Parish had failed to establish extraordinary and compelling reasons for release. On April 27, 2020, this Court denied Parish's request. On April 28, Parish began exhibiting some symptoms consistent with COVID-19 infection. On April 30, Parish was notified by the Bureau of Prisons that he has tested positive for the virus. Parish now asks this Court to reconsider the April 27, 2020 Order. Both the facts and the law, as stated below, support reconsideration.

FACTUAL BACKGROUND

I. *Residents of institutional facilities like federal prisons are at increased risk of contracting COVID-19.*

This Court has undoubtedly taken a crash course in the last six weeks, along with the rest of the federal judiciary, in the nature of infectious disease and its dangers in

1

institutional settings. There is no question that in settings in which social distancing and isolation is difficult or impossible, a highly communicable disease like COVID-19 will spread rapidly once introduced.[1] And the Bureau of Prisons is no exception. According to the most recent available data, although only a fraction of the BOP's residents have been tested for COVID-19, of all those who have been tested, roughly seventy percent have been positive.[2] While the CDC lists only medical conditions that are risk factors for the worst *consequences* of COVID-19, the data make clear that living in an institutional setting is a substantial risk factor for transmission of the virus. Indeed, Parish's positive test result underscores this.

Although the Court's Order did not restate the factual assertions made by the Government in its April 24 filing, a misstatement contained in that filing may have contributed to the Court's judgment and must be corrected. The Government rebutted Parish's claim that FCI Butner is a hotspot by distinguishing the infection rate at FCI Butner-Medium from that at FCI Butner-Low. Those facilities do appear to have substantially different rates of infection, with Butner-Low faring much better. Parish is not, however, at FCI Butner-Low as asserted by the Government. Parish is presently held at the minimum security camp, which is a satellite of FCI Butner-Medium:

---

[1] See Appendix A – COVID-19 facts and figures.
[2] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, Associated Press, https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f (April 29, 2020).

2



See *Find an inmate*, Bureau of Prisons (available at https://www.bop.gov/inmateloc/) (last accessed May 1, 2020 at 2:11 PM). The infection rate at the Medium includes all those who have tested positive at the camp. As of the last available data, that number is over 207, and 250 at the complex. Six inmates have been confirmed to have died at the Medium and satellite camp.[3] To announc each death, the Bureau of Prisons makes a press release. For each inmate at Butner who has died, the releases contain the nearly verbatim disclaimer: the inmate, "who had long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff." Appendix B – Press Releases. That the Bureau apparently depends on a template in order to efficiently report the deaths of inmates on its watch is chilling.

---

[3] *COVID-19 Coronavirus Resource*, Federal Bureau of Prisons (last accessed May 1, 2020) (available at http://www.bop.gov/coronavirus). *See also* Crystal Price, *Family of prisoners concerned as COVID-19 cases at Butner surpass 250*, CBS 17, https://www.cbs17.com/community/health/coronavirus/family-of-prisoners-concerned-as-covid-19-cases-at-butner-surpass-250/ (April 30, 2020).

Not only was the Bureau of Prisons slow to respond to the COVID-19 crisis, but it has been slow to implement its own internal guidance to furlough or release vulnerable inmates like Parish. During the third week of April—more than a month after COVID-19 was declared a global pandemic and weeks after acknowledging that the pandemic has created a crisis within the organization—the BOP stated, revised, and restated its guidance on who should be released from prison a dizzying number of times, with uneven application of the guidelines throughout the nation's federal correctional facilities.[4] Depending on which version of the guidelines Butner considered, Parish may well have been furloughed weeks ago, allowing him to quarantine at home during the pandemic and return to the facility when the crisis has subsided. But because BOP failed to act within its power, this Court has jurisdiction to act.

II. *Having been at risk, and now having contracted COVID-19, Al Parish is at increased risk of the most serious complications of COVID-19.*

While this Court noted, and Parish concedes, that his present health conditions do not independently establish a basis under Section 3582 for his release, the COVID-19 pandemic places individuals with certain pre-existing medical conditions at heightened risks for complications associated with the virus. The CDC lists several groups of people at heightened risk for severe illness from COVID-19, including those with diabetes, serious heart conditions, chronic kidney disease, and severe obesity.[5] Parish suffers from

---

[4] *See* C.J. Ciaramella, *Bureau of Prisons Reverses Coronavirus Home Confinement Policy*, Reason Magazine (April 21, 2020) (available at https://reason.com/2020/04/21/bureau-of-prisons-reverses-coronavirus-home-confinement-policy/). Scores, if not hundreds, of inmates were placed into quarantine, and their loved ones were notified of their impending release dates and made arrangements to transport them home, only to be turned away on the date of release without explanation.

[5] *People who are at Higher Risk*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed May 1, 2020).

each of these risk factors, and preliminary analysis from the CDC demonstrates that 78% of ICU admissions and 71% of all hospital admissions from COVID-19 were associated with persons having one or more pre-existing risk factors.[6]

Having now developed symptoms and tested positive for COVID-19, Parish can only wait in anxious anticipation for what may come next. Of course, his hope and the hope of his family is that he will avoid the worst the illness has to offer. But, unlike someone who becomes ill outside of custody, if Parish is hospitalized while in custody, not only will he be cut off from communicating with them about the course of the disease (as is tragically common for many people, not just those living in custody), but the BOP does not recognize medical powers of attorney or provide any meaningful information to family members other than death notices when and if the worst comes. And while neither Parish nor the Court can predict what will happen, the data tell us what is *substantially more likely* to happen to Parish.

And while COVID-19 morbidity is the most serious concern, as the pandemic unfolds, the long-term health effects of the disease are as yet unknown. The early data suggests many of the complications from the disease can create long-term or permanent damage to systems in the body.[7]

## ARGUMENT

---

[6] Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020. MMWR Morb Mortal Wkly Rep 2020;69:382–386, Centers for Disease Control and Prevention (April 3, 2020) (available at http://dx.doi.org/10.15585/mmwr.mm6913e2).

[7] *See*, Kelly Servik, *For survivors of severe COVID-19, beating the virus is just the beginning*, Science Magazine (April 8, 2020) (available at https://www.sciencemag.org/news/2020/04/survivors-severe-covid-19-beating-virus-just-beginning).

In its Order denying relief, the Court acknowledged its jurisdiction and discretion to grant compassionate release, when certain demographic or health factors are present or where other extraordinary and compelling reasons are present. Al Parish's pre-existing health conditions, coupled with the COVID-19 pandemic, and the Bureau of Prisons' mismanagement of the crisis, establish extraordinary and compelling justification to grant compassionate release in this case.

Compassionate release is a remedy to prevent needless suffering of incarcerated people and their families when debilitating or life-ending illnesses arise. Like all decisions related to sentencing, a decision to grant compassionate release is a balancing act, in which mercy gains new weight. All of the considerations required at sentencing by Section 3553(a) must still be given effect, while adding to the analysis information that was not available at the time of the original sentence.

Al Parish does not dispute the seriousness of his offenses. And if this Court were to grant compassionate release, such an order would not be a rebuke of the original sentence. It would, instead, be a reasonable—a compassionate—synthesis of the facts known at the time of sentencing with the facts before the Court today. In 2008, when he was sentenced, Parish was 50 years old. His sentence was very long but did not exceed the average life expectancy of a man of his age. Today, there is a very real possibility that even if his infection with COVID-19 does not cost him his life, it may very well shorten it and negatively affect the quality of life that does remain.

Few in the general public may be moved by Parish's plight. He wronged many financially and became infamous for both his flamboyance and his misconduct. Many will scoff that he ought not be given a "get out of jail free" card. But, however egregious his conduct, he was not and should not be consigned to die in prison; his family should not

suffer endless uncertainty and fear in the coming weeks and months. He has been in custody since June 26, 2008. For nearly twelve years he has done what he could to be useful to the prison community. In his twelve years in custody, our country has seen the election and two terms of the Obama administration and nearly the full first term of the Trump Administration. In his twelve years in custody, our country has survived one global financial panic and appears to be in the midst of a second. Twelve years is, by any measure, a very long time. The time Parish has already served did not reverse the conduct that resulted in his conviction, but nor can any future time he serves do that, no matter how miserable the circumstances. He presents no danger to the community. Section 3553(a) admonishes judges that sentences should be sufficient but no great than necessary. Parish's continued incarceration is unnecessary.

Few things are certain in this life—that each of us will die is one of them. Most of us do not know the time or manner of our deaths. For prisoners like Al Parish, while the time and manner remain uncertain, the Bureau of Prisons has permitted the COVID crisis to accelerate the time and dictate the manner for far too many already. At a minimum, prisoners like Parish should be permitted to live the remainder of their lives secure that they and their loved ones can navigate this unprecedented time without needless barriers to communication and safety. This Court can and should act, before it is too late, to provide Parish the opportunity to be treated for his many pre-existing conditions and his COVID-19 diagnosis outside of the custody of the Bureau of Prisons, which has demonstrated itself unable to protect the people in its care and unwilling to treat them or their families with even a modicum of decency during this extremely difficult time.

Respectfully submitted,

                                              BLAZER LAW FIRM
                                              1037 Chuck Dawley Blvd D100
                                              Mount Pleasant, SC 29464
                                              Telephone: (843) 732-4441

By:    */s/ Cameron Jane Blazer*
         Cameron Jane Blazer
         Federal ID Number: 10131

         Attorney for Defendant

Charleston, South Carolina
May 1, 2020

8